UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMANTHA BACHYNSKI,

                    Petitioner,                    Case Number 10-13762
                                                             Honorable David M. Lawson

v.

MILLICENT WARREN,

                    Respondent.
_____/

## OPINION AND ORDER CONDITIONALLY GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

      For eight days in early 2006, petitioner Samantha Bachynski accompanied her boyfriend, Patrick Selepak, on a violent crime spree in southeastern Michigan that left three people dead, including a pregnant woman and her husband. The petitioner was charged with aiding and abetting many of Selepak's crimes, and on October 20, 2006 a jury in Macomb County, Michigan found her guilty of two counts of first-degree murder under both premeditation and felony-murder theories, first-degree home invasion, possession of a firearm during the commission of a felony, unlawfully driving away a motor vehicle, kidnapping, assault on a pregnant woman intentionally causing miscarriage or stillbirth, and obtaining, possessing, or transferring personal identifying information with the intent to commit identity theft. Selepak already had pleaded guilty. Bachynski was sentenced to life in prison with no chance of parole. She challenges her convictions on several grounds in a petition for a writ of habeas corpus filed *pro se* under 28 U.S.C. § 2254. The respondent has filed an answer, asserting that the petitioner's claims lack merit, and some of them were not preserved properly in the state courts and therefore ought not to be addressed on the merits here. The Court concludes that although most of the petitioner's claims are meritless, one is not.

When the petitioner was arrested, she invoked her right to counsel at least twice. Despite her expression of the desire for an attorney, the police initiated contact with her and engaged in conduct that was the functional equivalent of interrogation. The state courts' holding that the practice was proper, and that the ensuing confession was constitutionally valid, was an unreasonable application of *Edwards v. Arizona*, 451 U.S. 477 (1981), and *Rhode Island v. Innis*, 446 U.S. 291 (1980). The error was not harmless, and therefore the petitioner is entitled to a conditional writ of habeas corpus.

## I.

The Michigan Court of Appeals affirmed the petitioner's convictions on direct appeal. It summarized the facts of the case as follows:

> This case arises out of the February 16, 2006 murder of Scott Berels and his wife Melissa Berels, who was pregnant at the time of her death. Defendant and her boyfriend, Patrick Selepak, were convicted of murdering the Berels and committing several related offenses. Defendant met Selepak over the Internet in August 2005 when she was 19 years old. They began a dating relationship in September 2005. Defendant was aware that Selepak served time in prison before they met and in November 2005, Selepak returned to prison. He was released in January 2006.
>
> On January 31, 2006, defendant accompanied Selepak to a Mr. Pita restaurant in Chesterfield, Michigan. Two witnesses testified that Selepak entered the restaurant just before closing time that night. After ordering food, Selepak pointed a handgun at the employees, forced them to lie on the floor, and took the security tape and $400–$600 in cash. Defendant testified that she waited outside the restaurant in her grandmother's van, at Selepak's instruction, but that she had no idea Selepak intended to commit a robbery. According to defendant, she did not suspect that Selepak had robbed Mr. Pita until later that night when they went out for an expensive dinner and she saw the cash.
>
> On February 13, defendant accompanied Selepak to a Dunham's Sports store in Flint, Michigan. According to store employees, Selepak entered the store and looked at the firearms and ammunition at least twice that day. That evening, defendant entered the store and approached employee Jason Ovick, who was working near the firearms counter. Ovick walked with defendant to a different part of the store and remained with her there for several minutes while she asked him a series of questions about treadmills and other equipment. During that time, Selepak entered the office of store manager Erin Tester, held a gun to her back, and announced that the store

was being robbed. He had Tester give him approximately $800 in cash from the safe, two guns from the firearms case, and ammunition. Selepak then called Ovick into the office and forced him to remove the guns' trigger locks. Defendant testified that she went inside the store with Selepak and then talked to an employee about treadmills, but that she did not know Selepak had robbed the store until later. Defendant initially told police officers that Selepak had asked her to distract the employee, but she testified at trial that she only talked to the employee because she believed Selepak planned to buy her a treadmill.

On February 15, defendant dropped Selepak off at the Berels' house in New Baltimore, Michigan. Melissa was a friend of Selepak's. Defendant returned to the house later that day. That night, defendant and Selepak were alone in the house with Scott and Melissa. Defendant initially told police officers that Selepak led Scott and Melissa into the bathroom and then told her that he was holding the couple hostage. Selepak pulled Melissa out of the bathroom and choked her until her face turned blue. He laid Melissa on the floor and told defendant to "take care of it" or "finish it." Defendant put her hand on Melissa's throat and felt her pulse, but tried not to squeeze her throat. Selepak then placed a bag over Melissa's head and a belt around her neck. He told defendant to pull the belt. Defendant held the belt, but tried not to pull hard. At some point after that, defendant could no longer feel Melissa's pulse. After Melissa died, Selepak had defendant retrieve a roll of duct tape from his bag and smoke a cigarette.

As Melissa was dying, Scott yelled for her from the bathroom. Selepak reentered the bathroom, bound Scott's limbs with the duct tape, put a sock in his mouth, and then covered his mouth with the tape. Selepak beat Scott with a rifle until there was blood everywhere. He then had defendant retrieve a knife and told her to cut Scott's throat. Defendant moved the knife across Scott's neck, but tried not to cut him. Later, Selepak told defendant to sit in the house and wait while he went to the store. Selepak returned from the store with beer and syringes. He then told defendant to inject Scott with bleach. She injected Scott at the ankle, but did not inject the bleach into his veins. Selepak tied Scott with an extension cord and put a bag over his head and a belt around his neck. He had defendant put her foot on Scott's head and pull the belt, while he was on Scott's chest. Defendant barely pulled the belt, but at some point she realized that Scott was dead. Defendant smoked another cigarette and at approximately 3:30 a.m. on February 16, drove to a CVS store and bought more duct tape. A CVS employee testified that defendant seemed very calm and said that she needed the tape for painting. When defendant returned from the store, she and Selepak cleaned, wrapped the bodies in plastic and tape and hid them in the house, took several items from the house including money and the Berels' identification, and then left in the Berels' vehicle.

After leaving the Berels' house, defendant and Selepak stopped for food. Selepak drove defendant home and she fell asleep in her mother's car. Later, defendant

entered the house. According to her mother's boyfriend Carlos Casillas, defendant seemed "out of it." She said that she had been babysitting all night long. Defendant ate, took medicine, and slept until 1:00 p.m. Later that day, defendant and Selepak left the Berels' vehicle on a side street in Detroit, Michigan. At around midnight, they went to Club Triangle in Flint. Defendant's friend Tara Beacham testified that she saw defendant at the bar. Beacham thought that defendant seemed completely normal. Defendant was smiling, seemed happy to see her, and danced on the dance floor. Defendant and Selepak planned to "befriend" an older, homosexual man at the bar and then stay with the man. Selepak pretended that he was homosexual and befriended Frederick Johnson. Defendant and Selepak spent the rest of the night in a hotel room with Johnson.

On February 17, defendant and Selepak spent the day eating and shopping with Johnson in Frankenmuth, Michigan. That afternoon, defendant and Selepak discovered that they were suspects in the Berels' deaths. They moved into Johnson's house near Clio, Michigan and attempted to change their appearances. Defendant cut and dyed her hair and Selepak shaved his head. That night, they went back to Club Triangle. Another friend of defendant's saw her at the bar that night. He testified that both defendant and Selepak had changed their appearances, and defendant told him that they "needed to change fast." Defendant was happy, confident, and had a good time dancing. On February 18, she and Selepak returned to Club Triangle with Johnson's son-in-law. On February 19 and 20, they ate and watched movies with Johnson at his house.

At approximately 1:00 a.m. on February 21, defendant awoke to Selepak yelling and pointing a rifle at Johnson. When Johnson ran, Selepak shot him twice. Johnson fell into the front yard. Defendant helped Selepak drag him back into the house. Selepak then put a plastic bag around Johnson's head and a belt around his neck. When defendant refused to help, Selepak strangled him. When Selepak told defendant to get a knife, she got a butter knife from the kitchen and poked Johnson with it several times. After Johnson died, Selepak drank beer and defendant smoked a cigarette. They wrapped the body in a tarp and put it in the back of Johnson's truck, cleaned the house, and then left in the truck.

Later that day, defendant and Selepak visited Beacham and agreed to drive her to a job interview at a hotel in Owosso, Michigan. During their time together, Beacham became suspicious of defendant and Selepak. After they dropped her off at the hotel, Beacham called the police. Shortly thereafter, police surrounded Johnson's truck in the hotel parking lot and arrested defendant and Selepak. Following her arrest, defendant waived her right against self-incrimination and her right to counsel and confessed her involvement in the crimes at issue. Defendant was first interviewed on February 21 by Detective Kenneth Stevens and Detective Sergeant Charles Esser. Defendant was interviewed again on February 22 by Lieutenant Michael Tocarchick and Sergeant David Dwyer.

-4-

When she was first interviewed by the police, defendant said that she loved Selepak so much that she was willing to do "just about" anything for him. She said that she never believed Selepak would harm her until she saw him choking Melissa on the night of the Berels' deaths. When the officers asked her why she stayed with Selepak and followed his instructions, even when she had the opportunity to escape, she said that she did not want to upset him and she was afraid he might hurt her. During her trial testimony, defendant said that on the night of the Berels' deaths, Selepak repeatedly snorted cocaine and pointed a gun at her, took her car keys, grabbed, pushed, and hit her, and threatened the lives of she and her entire family. She said that after the Berels' deaths, Selepak continued to threaten her life, that she hardly ate and tried to forget what had happened by going dancing, and that she only stayed with Selepak and followed his instructions to protect her own life and the lives of her family members. Defendant claimed that she omitted certain things and lied about other things during her taped police interview and the preliminary examination because the officers said that they could not help her unless she said exactly what they told her to say. Defendant cooperated to avoid going to prison.

*People v. Bachynski*, No. 281550, 2009 WL 723600, at *1-3 (Mich. Ct. App. Mar. 19, 2009) (footnote omitted).

The trial court sentenced the petitioner to life in prison for each first-degree murder conviction, life in prison for kidnaping and assault, 10 to 20 years in prison for home invasion, two to five years for unlawfully driving away an automobile, two to five years for identity theft, and two years for the firearm conviction. The petitioner's conviction was affirmed on appeal. *Ibid.*; *leave to appeal den.*, 485 Mich. 892, 772 N.W. 384 (2010). The petitioner did not pursue collateral relief in the state courts.

The petitioner filed a timely petition for writ of habeas corpus on the following grounds, all of which were asserted on direct appeal:

I.      Defendant was denied her due process right to an impartial jury as well as her right to the effective assistance of counsel because her attorneys failed to move for a change of venue where extensive and inflammatory pretrial publicity permeated the community and tainted the entire jury pool. (A) The pretrial publicity in Samantha Bachynski's case was excessive and the content of that publicity was inflammatory and prejudicial rather than factual. (B) Statistical analysis of the jury voir dire supports the conclusion that

-5-

defendant was denied her right to a fair trial where six of the twelve jurors were not asked if they had formed opinions about the case, and two jurors expressed prejudicial opinions, yet were left on the jury. (C) Defense counsel was ineffective for failing to move for a change of venue.

II.     Petitioner's convictions must be reversed because the fifth and fourteenth amendment [sic] to the United States constitution prohibit the use of physical restraints of which the jury is aware minus a special need particular to the case, and the court found no such special need when it ordered Samantha Bachynski shackled at trial. [C]ounsel was ineffective for failing to lodge a clear objection to the shackling and for doing nothing to mitigate the prejudice of the ankle restraints.

III.    Petitioner's constitutional right against compulsory self-incrimination was violated when the court declined to suppress statements taken by police after Defendant's request for counsel.

IV.     Petitioner was denied her constitutional right to present a defense when the primary defense witness became unavailable and the court disallowed admission of a prior statement that was against that witness's interest but exculpated defendant.

V.      The Court abused its discretion and deprived Petitioner of the constitutional right to present a defense when it disallowed the expert testimony of a forensic psychologist on the issue of duress.

VI.     Petitioner was denied due process when the court permitted the prosecutor to introduce, under the guise of similar acts, evidence of two prior armed robberies and one subsequent first-degree murder all committed by Patrick Selepak.

Pet. at 5-13. The warden filed a response asserting that claim I was "procedurally defaulted," that is, the petitioner did not comply with state procedures for presenting her claim to the state courts. She did not move for a change of venue in the trial court. The warden contends that the other claims are meritless.

The Court finds it unnecessary to address the question of procedural default. It is not a jurisdictional bar to review of the merits of an issue, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding

-6-

against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  Application of a procedural bar would not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  Because Bachynski filed her petition after the AEDPA's effective date, its standard of review applies.  Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions."  *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014); *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011).

## A.

The petitioner's first claim incorporates multiple issues. She contends that her trial attorney was constitutionally ineffective because he failed to move to change venue. She was prejudiced by that defective performance, she argues, because the jury pool was contaminated by the extensive and negative pretrial publicity. As a result, the petitioner believes that the jury selected was not impartial.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs the Court's analysis of ineffective-assistance-of-counsel claims. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Because of the high deference accorded state court determinations by AEDPA, establishing that counsel was ineffective and, therefore, the petitioner was denied her right to counsel under the Sixth Amendment, is difficult. The Supreme Court explained in *Richter* that

> "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Ibid.* Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

-9-

*Richter*, 562 U.S. at 105.

In other words, on habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Knowles*, 556 U.S. at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Ibid.* (citing *Alvarado*, 541 U.S. at 664).

The state appellate court resolved the ineffective-assistance-of-counsel issue by first addressing the issues of venue and jury selection. Finding that those issues lacked merit, and that "[a] a change of venue was not warranted," the court held that "counsel cannot be deemed ineffective for failing to make a futile motion." *Bachynski*, 2009 WL 723600, at *4. This Court will employ the same approach in deciding whether the state court's determination unreasonably applied federal law as proclaimed by the Supreme Court.

The petitioner contends that she was deprived of a fair jury because of extensive pretrial publicity. Once again, she says that her attorney should have moved for a change of venue, and by implication, that the state court's determination that no change of venue was required unreasonably misapplied Supreme Court precedent. The Supreme Court has held that a court should grant a defendant a change of venue if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722-24 (1961); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000).

-10-

1.

Presumptive prejudice from pretrial publicity occurs in a case where an inflammatory, circus atmosphere pervades both the courthouse and surrounding community. *Ritchie*, 313 F.3d at 952-53; *Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000); *Nevers*, 169 F.3d at 362-63; *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc). For that presumption to apply, the trial must be entirely lacking in the "solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Gall*, 231 F.3d at 310 (quoting *Murphy v. Florida*, 421 U.S. 794, 799 (1975)); *Nevers*, 169 F.3d at 363. Cases where prejudice from pretrial publicity is presumed are extremely rare, and even pervasive, adverse publicity does not inevitably lead to an unfair trial. *DeLisle*, 161 F.3d at 382.

Before the petitioner's trial, 245 newspaper articles were published about the crimes, several television reports were aired, and bloggers made several comments on the Internet. The state court of appeals found that, "[w]hile the media coverage of this case was extensive, the newspaper articles provided to us were primarily factual, rather than invidious or inflammatory." *Bachynski*, 2009 WL 723600, at *5. The court acknowledged that the articles contained many of the gruesome details of the kidnapping and murders, referred to Bachynski's confession, and labeled her the "Bonnie" of "Bonnie and Clyde." But that reality did not dissuade the court from its conclusion that the reporting was factual. Instead, the court mused: "That there may be no neutral way to report on this case is not the result of invidious or inflammatory media reporting, but rather, the facts of the case itself." *Ibid.* And based on those factual findings, the court held that the pretrial publicity did not create a presumption of prejudice.

That decision did not amount to either an unreasonable determination of the facts or a misapplication of Supreme Court precedent. "[I]t is well-settled that pretrial publicity itself — 'even pervasive, adverse publicity — does not inevitably lead to an unfair trial.'" *De Lisle*, 161 F.3d at 382 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). Rather, it is the nature and tenor of the publicity that must be examined. The hallmark cases generally referenced in presumption-of-prejudice decisions are *Irvin v. Dowd*, *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Sheppard v. Maxwell*, 384 U.S. 333 (1966), and *Estes v. Texas*, 381 U.S. 532 (1965). *See Skilling v. United States*, 561 U.S. 538, 381-82 (2010); *De Lisle*, 161 F.3d at 382. By any measure, the pretrial publicity in this case does not even approach the level of acerbity on display on those cases.

In *Irvin*, the defendant was accused of murdering a family of six. The crime "'aroused great excitement and indignation,'" 366 U.S. at 719, in the small community of Evansville, Indiana. As the Court described it, the pretrial "build-up of prejudice," due to an abundance of detailed newspaper articles, was "clear and convincing." *Id.* at 726.

> These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty.

*Id.* at 725-26.

The defendant in *Rideau* was arrested a few hours after he allegedly robbed a bank, kidnapped three bank employees, and killed one of them. "The next morning a moving picture film with a sound track was made of an 'interview' in the jail between Rideau and the Sheriff. . . . This

-12-

'interview' lasted approximately 20 minutes. It consisted of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder." 373 U.S. at 724. This confession was televised on three occasions over the next three days. *Ibid.* Of the 150,000 people in the parish, 20,000 saw the confession on television, including three of the actual jurors in the case. Two of the jurors were deputy sheriffs in the same parish, and cause challenges of those two jurors were rejected.

The "carnival atmosphere" appellation was created to describe the in-court events in *Sheppard* and *Estes*:

> The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

*Murphy*, 421 U.S. at 799.

The petitioner does not suggest, and the record does not disclose, a trial atmosphere in this case that even approximated the free-for-all that prevailed in *Sheppard* and *Estes*. Similarly, the pretrial publicity in this case did not proclaim the petitioner's guilt, display a video account of a confession, or advocate punishment or severity of sentence. Most of the stories simply provided "bare-bones facts" about the petitioner's case. *Deel v. Jago*, 967 F.2d 1079, 1087-88 (6th Cir. 1992). Many of the articles also appear to be sympathetic to the petitioner. A number of them referred to the petitioner and her co-defendant as "persons of interest," rather than suspects and cast

-13-

the petitioner as a naive 19-year-old girl who was either manipulated by a former convict exploiting her fear of retaliation if she did not cooperate in the robberies and murders, or was infatuated with her co-defendant and under his spell. Some of the articles could be characterized as promoting her defense at trial, asserting that her confession was taken improperly. The *Macomb Daily* March 3, 2006 article, with the headline "Confessions Contested in Double Slaying: Defense Attorney Says Suspect Asked For Attorney But Questioning Continued," reported that "officials and family members indicated in court Thursday, Patrick Alan Selepak may have persuaded and pressured co-defendant Samantha Jean Bachynski to join him in a rash of robberies and murders. Later a defense attorney contends, police may have pressured and coerced one or both into giving confessions." Many of the blog comments were much more critical. However, those remarks were not disseminated to the same extent as newspaper comments throughout the community. They cannot be said to have permeated the community with bad will.

Citing *Rideau*, the petitioner argues that newspaper accounts relating the content of her confession tainted the entire Macomb County community and deprived her of a fair trial. The Sixth Circuit has held that reports in the print media of a confession will not map a case onto *Rideau*'s holding, in which the confession actually was televised. *De Lisle*, 161 F.3d at 384 (stating that "[t]he *Rideau* Court did not purport to create a rule that the dissemination of the fact of a defendant's confession through some other, less dramatic and compelling medium, is equally a violation of the Due Process Clause").

Nor does any evidence derived from the jury selection in this case suggest that prejudice in the community could be presumed. As the state appellate court found, only one juror was excused for bias, and the petitioner did not exercise all of her peremptory challenges. Two of the empaneled

-14-

jurors stated that they had opinions about the case (which they said they could put aside), but the others said that they had either some familiarity with the case or knew nothing of it. The court of appeals determined that those responses did not warrant a finding that the entire jury venire, in a county of over 832,000 people, was presumptively biased. *Bachynski*, 2009 WL 723600, at *5 & n.2. That determination itself was reasonable, and reasonably applied *Irvin*, *Rideau*, *Sheppard*, and *Estes*.

2.

In a case where pretrial publicity cannot be presumed to be prejudicial, the trial court still must determine whether the publicity rose to the level of actual prejudice. *Ritchie*, 313 F.3d at 962; *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). The primary tool for determining if actual prejudice has occurred is a searching *voir dire* of prospective jurors. *Ibid.* The court must review the media coverage itself and the substance of the jurors' statements at *voir dire* to determine whether a "community-wide sentiment" exists against the defendant. *Nevers*, 169 F.3d at 366. Negative media coverage by itself is insufficient to establish actual prejudice. *Id.* at 366-67.

Common techniques used to search out and eliminate potential juror bias include pretrial juror questionnaires, individual and segregated *voir dire* questioning, allowance of additional peremptory challenges, and attorney-conducted *voir dire* questioning. *See, e.g., Skilling*, 561 U.S. at 395-99. None of that occurred in this case (although all of the attorneys participated with the court in the questioning); the defense made no request for any of these measures, and the trial judge did not initiate them on his own. Nonetheless, there is a thorough record of the jury *voir dire*, the details of which prompted the state court of appeals to conclude that an impartial panel was selected. *Bachynski*, 2009 WL 723600, at *7. The essence of impartiality has been described as a "mental

-15-

attitude of appropriate indifference." *United States v. Wood*, 299 U.S. 123, 145-46 (1936). But "the Constitution lays down no particular tests[,] and procedure is not chained to any ancient and artificial formula." *Ibid.* Moreover, reviewing courts must be "attentive to the respect due to [lower]-court determinations of juror impartiality and of the measures necessary to ensure that impartiality." *Skilling*, 561 U.S. at 387. That is especially so in a habeas proceeding. *Harrington*, 562 U.S. at 103.

In arguing that the jury was contaminated by actual bias, the petitioner points to the fact that six of the fourteen jurors were not asked if they held prejudicial opinions about petitioner or her case. Three had heard of the case and Juror One expressed the belief that presence at a crime scene had to show a little guilt, while Juror Five mentioned that when someone is charged with a crime "you start to wonder." However, all of the jurors expressed the ability to ignore their suppositions and decide the case on the evidence presented in court. As the state appellate court found:

> Out of the 14 members of the panel, two said they knew nothing about the case, three said they knew very little about the case and had not heard about it for months, three indicated they were aware of the case, but they were not specifically asked about the level of their exposure to the case, and six said they were familiar with the facts of the case through media exposure or conversations with acquaintances. Out of the 14 members, only two initially expressed having any opinions or notions about the case, and after further instruction by the trial court and questioning by the attorneys, they both stated that they could set their opinions aside and be fair and impartial.

*Bachynski*, 2009 WL 723600, at *6. That some of the jurors may have harbored tentative feelings in the beginning is not enough to establish actual prejudice, and "even the 'existence of a [] preconceived notion as to the guilt or innocence of an accused, without more, is [not] sufficient to rebut the presumption of a prospective juror's impartiality.'" *Nevers*, 169 F.3d at 367 (quoting *Irvin*, 366 U.S. at 723).

-16-

The petitioner also contends that the trial court judge should have engaged in a much more detailed and individualized *voir dire* of each potential juror to explore their exposure to pretrial publicity. Perhaps that would have been prudent in this case, in light of the media accounts. However, the court's reluctance to do so could be reflected by defense counsel's concern, when he stated:

> Mr. Markowski [defense counsel]: The problem and the point that Ms. Tobin, the problem arises Judge, I believe if you do it in front of everybody else you may taint the rest of the jury pool as far as the extent of what they heard.

Trial Tr. at 9 (Oct. 3, 2006). Of course, individual and sequestered *voir dire* would have assuaged that concern. But neither more searching questioning nor a specific *voir dire* method is constitutionally required. Trial courts enjoy "wide discretion . . . in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991); *see also Richie v. Rogers*, 313 F.3d 948, 961-63 (6th Cir. 2002) (observing that "the majority [in *Mu'Min*] found no error in the trial court's denial of individual voir dire and approved the trial court's refusal to allow prospective jurors to be questioned about specific contents of news reports.").

The Michigan Court of Appeals's conclusion that no change of venue was required by the pretrial publicity in this case did not unreasonably apply federal constitutional law as determined by the governing Supreme Court cases. It follows, then, that trial counsel's failure to move for a venue change cannot constitute ineffective assistance of counsel. *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2014) (holding that "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial"); *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000) (holding that "trial counsel's failure to object to [admissible evidence] . . . was not deficient").

-17-

B.

The petitioner sat through her trial in leg restraints.  The trial court articulated no particular reason for the shackling, other than to note that the local sheriff's policy required it.  The petitioner argues that having to sit in shackles in the jury's presence violated her right to due process, and her trial counsel was constitutionally ineffective because he did not object forcefully enough or do anything to "mitigate the prejudice."  The Michigan Court of Appeals agreed that the use of ankle restraints in the circumstances of the petitioner's trial was unconstitutional, but it held that the petitioner suffered no prejudice, because "efforts were made to conceal the leg restraints from the jury and there is no evidence that the jury was aware of them."  *Bachynski*, 2009 WL 723600, at *8.

The court of appeals was correct on both counts.  In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  *Id.* at 629.  *Deck*'s holding, however, "concerned only visible restraints at trial." *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008).  The petitioner has identified nothing in the record to counter the state appellate court's finding that her leg restraints were not visible to the jurors at her trial.  To the contrary, the record indicates that "[t]he trial court determined that the jurors would not be able to hear the restraints when defendant was seated; a curtain surrounded the area where she was seated; she did not walk in front of the jury wearing the restraints; and she was not wearing the restraints during her testimony." *Bachynski*, 2009 WL 723600, at *8.

The petitioner rests her argument on the possibility that some of the jurors saw or heard the shackles.  But there is no evidence in the record to support that speculation.  Her supposition is not

-18-

enough to undermine the presumption of correctness on the facts that the state court enjoys. 28 U.S.C. § 2254(e)(1); *Treesh v. Bagley*, 612 F.3d 424, 430. n.1 (6th Cir. 2010) (noting that "clear and convincing evidence" is required to rebut the presumption).

The petitioner contends that defense counsel's response to the shackling was anemic. Perhaps. The state appellate court did indicate that "defense counsel lodged what can only be characterized as a timid objection to the shackling of his client in leg restraints." *Bachynski*, 2009 WL 723600, at *8 (internal quotation marks omitted). However, the court recognized defense counsel's response as an objection, found that the error was preserved, and addressed the issue on the merits. Moreover, because the jury was not aware of the restraints, the petitioner cannot establish the prejudice to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 687.

## C.

When the petitioner was taken into custody, she was given *Miranda* warnings by at least two different police officers. Each time she invoked her right to an attorney. However, the police officers made contact with the petitioner again on their own initiative, this time to ask her if she had been given access to a telephone to call a lawyer, or a phone book to identify one. The officers also told her that Patrick Selepak had made a statement. Then, according to the police, "Defendant . . . said that, 'She was 19 years old. She did not want to spend the rest of her life in prison, and she asked if she really needed an attorney.' Detective Esser advised defendant that she had requested an attorney and that they could not discuss anything further with her until her attorney was present. Defendant asked if she could change her mind, and then pointed at Detective Stevens and said, 'I want to talk to you.'" *Bachynski*, 2009 WL 723600, at *9. The state appellate court acknowledged that the police were obliged to cease all questioning once the petitioner requested an attorney, unless

-19-

she initiated contact herself.  However, the court found that the officers' renewed contact did not amount to questioning.  The court explained that "[g]enerally, a mere inquiry whether the accused has changed her mind about wanting the presence of counsel is not an interrogation initiated by the police; nor is informing the accused that a codefendant has given a statement, ninety minutes after the accused has invoked her *Miranda* rights."  *Bachynski*, 2009 WL 723600, at *10.  The Court believes that holding, under the circumstances of the encounter in this case after the petitioner had invoked her right to counsel, unreasonably applied *Edwards v. Arizona*, 451 U.S. 477 (1981), and *Rhode Island v. Innis*, 446 U.S. 291 (1980).

The Fifth Amendment, which is made applicable to the states by the Fourteenth Amendment, protects an accused from compulsory self-incrimination.  In *Miranda v. Arizona*, the Supreme Court held that this prohibition against compelled self-incrimination requires a custodial interrogation to be preceded by advice that the accused has the right to an attorney and the right to remain silent. 384 U.S. 436, 479 (1966).  It is settled law that if the accused invokes her right to counsel, "the interrogation must cease until an attorney is present."  *Id.* at 474.  In *Edwards v. Arizona*, the Supreme Court "reconfirm[ed]" the rule established in *Miranda*, that when a suspect has invoked the right to have counsel present during custodial interrogation, the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484-85; *see also United States v. Dupree*, 323 F.3d 480, 486 (6th Cir. 2003).  Moreover, after a suspect has invoked her right to counsel, "a valid waiver of that right cannot be established by showing only that [s]he responded to further police-initiated custodial interrogation even if [s]he has been advised of [her] rights."  *Id.* at 484.  This rule "is designed to prevent police from badgering

-20-

a defendant into waiving [her] previously asserted *Miranda* rights." *Davis v. United States*, 512 U.S. 452, 458 (1994) (internal quotation omitted).

 In this case, it is undisputed that the petitioner asked for counsel when police interrogated her on February 21, 2006.    The petitioner was in a holding cell at the Owosso city police department.  An officer from Genesee County had contacted  her earlier, and she stated that she wanted an attorney.  At around 6:10 p.m., Sergeant Charles Esser and Detective Kenneth Stevens of the New Baltimore police department came to the police station and had Bachynski brought from the holding cell to the interview room.  Esser read Bachynski her *Miranda* rights again.  Esser testified that he knew she previously had asked for an attorney, but he thought that because he was from a different department he could try to question her anyway.  Bachynski once again invoked her right to counsel, however.  Esser and Stevens stopped their questioning; and Bachynski, after finishing a cigarette, was taken back to the holding cell.

About 30 minutes later, Esser and Stevens again made contact with Bachynski in her holding cell.  They testified that their purpose was to ask if she had been given access to a phone to contact an attorney.  The petitioner testified at the suppression motion hearing and described the encounter as follows:

> Q.    And when were you, if you know, approached by Detective Stevens?
> A.    It was later on that night.
> Q.    Okay.  And where were you physically when you were –
> A.    I was in the inside the holding cell.
> Q.    And could you tell the Court what had transpired?   How did that communication and conversation start and who initiated it?
> A.    He, Detective Stevens, came in and asked me if I had a lawyer I could contact and I told him no.   And he asked me if my family knew anybody. I told him no, we didn't have money for an attorney.
> Q.    Okay.  Did you tell him you wanted a lawyer though?
> A.    He didn't ask me so I didn't say anything.
> Q.    Okay.  All right.  Did you have any other conversation with him?

A.   He made the comment that people were already talking to Patrick, and that at one point before a time, sometime before Patrick and his brother got into trouble and that Patrick told his brother not to say anything and Patrick's brother ended up getting into more trouble. I told him Patrick's sister told me about that before.

Q.   So you informed Detective Stevens of that?

A.   He started the conversation with me about it and I told him that I heard about it before.

Q.   Okay. All right. And after that how were you feeling?

A.   I felt he was telling me I was going to get into more trouble if I didn't talk to him.

Q.   Did he tell you that you were facing some pretty serious trouble at that time when he was talking to you?

A.   No.

Q.   And after he made that comment did he make any further statement to you or ask you?

A.   Not at that time. It took him a minute before he said anything else.

Q.   Right. What did he say?

A.   I don't remember if it was Esser or Stevens. One of them said, reminded me earlier I was told I could change my mind.

Q.   Pardon?

A.   They told me earlier I could change my mind if I wanted to come and talk to them.

Q.   They told you that?

A.   Yes.

Q.   And what were you thinking when they told you that?

A.   I just, I didn't want to be in trouble.

Q.   Okay. Did they give you any indication that if you spoke to them that you perhaps would not get in trouble?

A.   No, but the way they made it sound was that Patrick was blaming me for everything that happened.

Q.   Okay. And at what point in time did you then decide to continue or speak further with Detective Stevens?

A.   After that comment was made.

Q.   Who else was present during that conversation? Was it only Detective Stevens and Sergeant Esser?

A.   There were some uniform officers outside the door.

Q.   Did you overhear any conversation that those officers may or may not have had outside that door?

A.   No.

Q.   How long after Detective Stevens made those comments to you did you end up eventually talking with him and giving the statement?

-22-

A.      I am not exactly sure how long it was.  They stepped outside of the room and I don't remember if it was them that came and got me or a uniform guard from Owosso.

Q.      You heard the testimony, did – strike that.   How long, if you know, how long had you been in custody prior to talking with Detective Stevens.

A.      I don't know.  I never saw a clock.

Q.      So your lack of time frame is because there is no windows or anything that?

A.      No, there wasn't any windows I could see out.

Hr'g Tr. at 87-90 (Sept. 6, 2006).

Neither Esser nor Stevens confirmed all the particulars of this conversation.  Stevens did acknowledge that Bachynski was aware that Selepak was being questioned. *Id.* at 54.  Esser testified that Selepak was talking to detectives, and it was important to him to get a statement from Bachynski at that time. *Id.* at 73.  Neither police officer explained how Bachynski came to the knowledge that Selepak was making a statement.  The trial court made no finding on that question, but the court of appeals appears to have accepted the petitioner's version, at least in part, when it held that informing a suspect that an accomplice made a statement did not constitute interrogation.

It is undisputed that the police ceased questioning the petitioner when she invoked her right to counsel a second time, as *Edwards* commands.  In fact, *Edwards* required police to cease interrogating the petitioner while in custody about any investigation, because the Fifth Amendment right to counsel is not offense specific.  It matters not that a subsequent interrogation focuses on a different crime, *Arizona v. Roberson*, 486 U.S. 675, 681 (1988), or that the questioning is conducted by a different law enforcement authority, *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). Subsequent custodial interrogation is not allowed even when the suspect has met with an attorney after the first interrogation. *Ibid.*  It is only after custody ends and time passes — at least fourteen days, according to the Supreme Court, *Maryland v. Shatzer*, 559 U.S. 98, 110-11 (2010) — that the

-23-

invocation of the right to counsel and the "protective umbrella" provided by *Edwards* closes on a subsequent custodial interrogation. *Id.* at 109 (quoting *Solem v. Stumes*, 465 U.S. 638, 644, n.4 (1984)).

The Supreme Court has made clear that "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citing *Edwards*, 451 U.S. at 485, 486, n.9). In this case, the record plainly shows that Bachynski did not initiate the second encounter with Stevens and Esser in her holding cell. The state courts appear to have rested their holding, however, on the idea that the officers' second contact did not constitute "questioning."

It is true that neither Esser nor Stevens directly asked Bachynski about the events of the previous eight days when they confronted her the second time that day. But interrogation, within the meaning of *Edwards*'s and *Miranda*'s limitations, amounts to more than simple question-answer dialogue. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. at 300-01. The techniques may be subtle: "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Ibid.*

In this case, when Stevens and Esser initiated their second contact with Bachynski, ostensibly for the purpose of giving her access to a phone to call a lawyer, they told her that Selepak was talking to the police. Bachynski testified that they related a story about a previous occasion

-24-

when Selepak's brother refused to talk to police on Patrick's instructions and suffered consequences. The question presented by that testimony is whether the officer's utterance constituted "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Innis*, 446 U.S. at 301. Plainly, it is. In *Nelson v. Fulcomer*, 911 F.2d 928 (3d Cir. 1990), *superseded by statute on other grounds*, Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, as recognized in *Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996), the court held that the functional equivalent of an interrogation occurred when the police arranged for an accomplice to tell the petitioner that he had made a statement to the police. The petitioner previously had invoked his right to silence. The court stated that "[t]he ploy of confronting a suspect with his or her alleged partner in crime and claiming that the partner has confessed is indistinguishable from the types of police practices explicitly criticized in *Miranda* and *Innis*." *Id.* at 935.

In *United States v. Szymaniak*, 934 F.2d 434 (2d Cir. 1991), the defendant had been arrested after crossing into the United States from Canada, and he told agents that he wanted to consult with a lawyer. The agents subsequently arrested an individual who they believed had been smuggled into the country by the defendant. After the individual made a statement, the agent contacted the defendant, told him what the individual said, and "asked him again if he would care to clear this matter up and give us a statement." *Id.* at 437. The court held that "[s]uch behavior was calculated to elicit an incriminating response." *Id.* at 439.

The Sixth Circuit considered a slightly different set of facts in *Shaneberger v. Jones*, 615 F.3d 448 (6th Cir. 2010). There, the petitioner invoked his right to counsel during custodial interrogation. However, the detective, Richard Rau, then told the petitioner that his "partner" had

confessed and implicated him in the crime.  Rau followed that statement with the instruction that the petitioner should not respond to him at that time, and Rau left the room.  *Id.* at 451, 454.  While the petitioner was being transported to the county jail some time later, he broke down and confessed to another police officer that he was involved in the robbery and homicide under investigation.  The court found no violation of the petitioner's Fifth Amendment right, mainly because (a) the petitioner confessed to a police officer different from Detective Rau, and (b) Rau left the room immediately after planting his seed and did not give the petitioner the chance to speak.  However, the court determined that "[t]here is little doubt that Detective Rau's actions tread near the line between what is acceptable and what violates Shaneberger's right to counsel.  Without the specific portions of the statement discussed [above], Detective Rau's comment would fit squarely within the category described by *Innis* as interrogation."  *Id.* at 454.

In this case, the officers told Bachynski that Selepak was talking, but they did not tell her that Selepak had implicated her in the crime spree.  However, the officers coupled their statement with a cautionary tale of Selepak's brother who encountered more trouble when he refused, at Selepak's behest, to talk to the police.  The state court of appeals determined that merely "informing the accused that a codefendant has given a statement" after the accused has invoked *Miranda* rights does not constitute interrogation.  *Bachynski*, 2009 WL 723600, at *10.  But that ruling fails account for all the circumstances of the encounter, and therefore it does not faithfully apply the holding in *Innis* that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning *or its functional equivalent*."  446 U.S. 300-01 (emphasis added).  It is apparent from the record that telling Bachynski that Selepak was making a statement, after she had refused to do so without an attorney, was a practice that the officers "*should have known* w[as] reasonably

likely to elicit an incriminating response." *Id.* at 302.  Coupled with the warning about the brother

who would not talk, there can be no doubt that the effect of Stevens's and Esser's second encounter

with Bachynski was likely to elicit an incriminating response.

Bachynski's statement to the New Baltimore police officers should have been suppressed.

Instead, it was introduced in evidence at her trial.  The statement furnished significant and detailed

evidence about Bachynski's involvement in the crimes.  It is clear that it had a substantial and

injurious effect and influence on determining the jury's verdict in this case.  *Brecht v. Abrahamson*,

507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In

*Arizona v. Fulminante*, 499 U.S. 279 (1991), the Court explained:

> A confession is like no other evidence.  Indeed, "the defendant's own confession is
> probably the most probative and damaging evidence that can be admitted against him
> . . . .  [T]he admissions of a defendant come from the actor himself, the most
> knowledgeable and unimpeachable source of information about his past conduct.
> Certainly, confessions have profound impact on the jury . . . .'"

*Fulminante*, 499 U.S. at 296 (alteration in original; citations omitted).  So it was in this case.  The

jury heard the petitioner's own incriminating account of the horrid events of those eight days in

February 2006.  The confession in this case was "probative and damaging."  *Moore v. Berghuis*, 700

F.3d 882, 889 (6th Cir. 2012) (citation omitted).  The prosecution used it "in building its case of

first-degree murder against" the petitioner.  *Ibid.*  The petitioner is entitled to a writ of habeas corpus

on this claim.

### D.

At trial, the petitioner attempted to introduce Patrick Selepak's confession into evidence, in

which he repeatedly exonerated the petitioner by stating that she was not an active participant in the

crimes.  The trial court excluded the out-of-court statement as inadmissible hearsay.  The court of

appeals affirmed, holding that although the statement plainly was against Selepak's penal interests, there was insufficient corroborating evidence to support the trustworthiness of the exonerating portions of the statement. *Bachynski*, 2009 WL 723600, at *12. In her petition, Bachynski argues that this ruling deprived her of important evidence and interfered with her right under the Sixth Amendment to present a defense.

The Sixth Amendment provides an accused with the right to "compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, a crucial part of the Constitution's more basic guarantee of "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). As applied to the states by the Due Process Clause of the Fourteenth Amendment, the accused has the right at trial to present testimony that is "relevant," "material," and "vital to the defense." *Washington v. Texas*, 388 U.S. 14, 16 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (stating that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (citations omitted)). However, the "right to present relevant evidence is not unlimited" and "is subject to reasonable restrictions" imposed by the criminal process. *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (holding that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused" (citations omitted)).

A violation of the fundamental right to present a defense is not established merely by showing that the trial court excluded evidence relevant to that defense. Rather, a petitioner must show that the exclusion of evidence "significantly undermined fundamental elements of the defendant's defense." *Scheffer*, 523 U.S. at 315. Put another way, the exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." *Id.* at 308 (citing *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)). Applying this standard in a habeas corpus case, the Sixth Circuit has held that the right to present a defense is abridged by an evidentiary ruling excluding defense evidence "[o]nly if 'an evidentiary ruling is so egregious that it results in denial of fundamental fairness.'" *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004) (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)); *accord Alley v. Bell*, 307 F.3d 380, 394-95 (6th Cir. 2002) (finding that exclusion of evidence is unconstitutional only when it eviscerates a defense); *see also Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010). Therefore, even if exclusion of evidence was erroneous under state law, the constitutional right to present a defense is not abridged unless the evidence was so material that it deprived the defendant of a fair trial. *Allen v. Howes*, 599 F. Supp. 2d 857, 872 (E.D. Mich. 2009).

To determine whether the state courts arbitrarily applied their rule of evidence — in this case, Michigan Rule of Evidence 804(b)(3), which limits the admission of statements against penal interests "tending to expose the declarant to criminal liability and offered to exculpate the accused" to those cases in which "corroborating circumstances clearly indicate the trustworthiness of the statement" — it is useful to examine a federal evidence analog. *See Wynne*, 606 F.3d at 871. In this case, that analog is found in Federal Rule of Evidence 804(b)(3)(B), which also requires that an exculpatory out-of-court statement against the declarant's penal interest be supported by

-29-

"[c]orroborating circumstances [that] clearly indicate the trustworthiness of the statement." *United States v. Price,* 134 F.3d 340, 347 (6th Cir. 1998) (quoting *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993)). Factors to assess in determining whether adequate corroborating circumstances exist include the presence or absence of a close relationship between the declarant and the defendant, whether the declarant received *Miranda* warnings before speaking, and the existence of evidence suggesting that the declarant was attempting to curry favor with the authorities. *Id.* at 348.

The Michigan Court of Appeals found a lack of sufficient corroborating circumstances, reasoning:

> Selepak made his confessions several days after the Berels' deaths, during in-custody interviews with police. Although he implicated himself in the crimes at issue and stated that defendant was not an active participant, he also admitted that he was romantically involved with defendant. This suggests that Selepak may have minimized defendant's role in the crimes in order to protect her. In fact, when police questioned Selepak about defendant's involvement in the Berels' deaths, he repeatedly made statements such as, "It wasn't her, it was me," "she's not like that," "this is my fault," "I'm taking responsibility," "I can't help you," "I'm not gonna say it," and "she might get off a little bit won't she?" Further, Selepak's statements that defendant was present at the Berels' home, but had no involvement in their deaths, does not comport with the evidence presented at trial. Law enforcement officers found bleach and bloodstains on the clothing defendant wore the night of the murders, and defendant herself testified that Selepak forced her to participate in the murders. Selepak's statements that defendant had nothing to do with the Berels' deaths completely contradicts her entire theory of the case.

*Bachynski*, 2009 WL 723600, at *13. That decision did not arbitrarily or unreasonably apply the limitations on the admission of out-of-court statements prescribed by the Michigan Rules of Evidence. Those rules are intended to enhance the likelihood that the evidence presented to a jury is trustworthy. When the declarant is not available to testify, as Patrick Selepak made himself at Bachynski's trial by his refusal to testify or even take the oath, his testimony could not be subjected to cross-examination, "the greatest legal engine ever invented for the discovery of truth." *California*

*v. Green*, 399 U.S. 149, 158 (1970) (internal quotation marks and citation omitted). The state courts applied their rational evidence rule in a non-arbitrary manner. Exclusion of the evidence was not disproportionate to the purpose the rule was intended to serve. The state courts' decision did not unreasonably apply *United States v. Scheffer*.

E.

The petitioner also contends that the trial court abridged her right to present a defense when it excluded the testimony of Dr. Michael Abramsky, a psychologist who intended to provide an opinion on the defense of duress. Dr. Abramsky had examined the petitioner and was prepared to testify that she suffered from a condition similar to Stockholm Syndrome to explain why the petitioner never tried to free herself from Selepak when she had the opportunity to do so during the eight-day crime spree. But because the Michigan Supreme Court had eliminated the defense of diminished capacity, *People v. Carpenter*, 464 Mich. 223, 627 N.W.2d 276 (2001), and under Michigan law duress is not a defense to murder, *People v. Etheridge*, 196 Mich. App. 43, 56, 492 N.W. 2d 490, 497 (1992), defense counsel initially struggled to find a valid purpose for the evidence when asked for an offer of proof. Later in the trial, he settled on the idea that he would ask for a duress instruction on the non-homicide counts, and Dr. Abramsky's testimony would be relevant to that. The trial court rejected the evidence because it believed the defense theory was too close to the discredited diminished capacity defense, the testimony would confuse the jury, it might be misapplied to the homicide counts, and the duress defense would not be supported by expert testimony.

On appeal, the petitioner argued that the expert testimony would have supported a theory similar to battered woman syndrome. The court of appeals rejected that argument, finding that the

-31-

testimony would not have been helpful to the jury to explain that specific theory or the defense of duress in general. The court observed that petitioner had to prove the elements of duress by objective facts, that is, circumstances showing that a reasonable person in her position would have feared death or serious injury if she had not assisted Selepak in his crimes. The court held that Dr. Abramsky's proposed testimony would not have been helpful to such a determination. *Bachynski*, 2009 WL 723600, at *13.

As the state court observed, the petitioner was allowed to present her duress defense. The exclusion of Dr. Abramsky's testimony did not deprive her of that right. She did not "have a constitutional right to the presentation of expert testimony." *Moreland v. Bradshaw*, 699 F.3d 908, 923-24 (6th Cir. 2012) (quoting *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001)). The state court's exclusion of that evidence on state evidentiary grounds did not violate the Constitution or federal law. *See Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005).

The state court determined that the expert's testimony was not relevant or helpful. Even if that decision were incorrect, it is well settled that errors in the application of state law, especially rulings on the admission or exclusion of evidence, generally are not questioned on habeas corpus review. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)). That is because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984), and *Rose v. Hodges*, 423 U.S. 19, 21–22 (1975) (per curiam)). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241 and *Hodges*, 423 U.S. at 21).

-32-

The petitioner is not entitled to habeas relief on this claim.

F.

In her sixth claim, the petitioner argues that the trial court abused its discretion when it admitted evidence of other crimes committed by her and the co-defendant. Those crimes included the robbery at Mr. Pita and the killing of Frederick Johnson. The state court of appeals held that the evidence was admissible under Michigan Rule of Evidence 404(b).

An alleged violation of state evidence rule 404(b) is not cognizable on habeas review. "[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). The Supreme Court has declined to hold that the admission of "other acts" evidence is so extremely unfair that it violates fundamental conceptions of justice. *Dowling v. United States*, 493 U.S. 342, 352-53 (1990). The Court has discussed when other acts testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988), but has not addressed the issue in constitutional terms. Such matters are more appropriately addressed in codes of evidence and procedure than under the Due Process Clause. *Dowling*, 493 U.S. at 352. "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no "clearly established federal law" to which the state court's decision could be "contrary" within the meaning of section 2254(d)(1). *Id.* at 513. Therefore, the Court must deny habeas relief on this claim.

III.

The Court finds that the New Baltimore police officers initiated contact with the petitioner after she had invoked her right to counsel, and they engaged in conduct that they should have known was reasonably likely to elicit an incriminating response from her. The state courts' ruling that no constitutional violation occurred was an unreasonable application of *Edwards v. Arizona* and *Rhode Island v. Innis*. The admission of the petitioner's ensuing confession at trial was unlawful and prejudicial. The petitioner, therefore, has established that she is in custody in violation of her federal constitutional rights. *See* 28 U.S.C. § 2254(d).

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is conditionally **GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings her to trial again within seventy days, subject to the exclusions from such period allowed by 18 U.S.C. § 3161(h).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 30, 2015

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 30, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI

---

-34-